# United States Tax Court

T.C. Memo. 2025-128

KEVIN J. MIRCH AND MARIE C. MIRCH,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 16277-16L.                    Filed December 11, 2025.

_____

*Kevin J. Mirch* and Marie C. Mirch, pro se.[1]

*Heather K. McCluskey*, *Jennifer A. Brooker*, *Andre J. Kim*, and *Donna L. Crosby*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: Petitioners initiated this collection due process (CDP) case for review of a Notice of Determination sustaining the filing of a Notice of Federal Tax Lien (NFTL) for their unpaid tax liabilities for 2004, 2006, and 2008.[2] After concessions, the only year remaining at issue with respect to the NFTL is 2006. Also at issue is petitioners' underlying tax liability for 2006.

_____

[1] On December 5, 2024, Mr. Mirch entered an appearance in this case as counsel for himself. At trial we recognized Mr. Mirch as pro se and allowed him to testify. We treat each petitioner as pro se.

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts have been rounded to the nearest dollar.

**[*2]**    After concessions, the issues for consideration are (1) whether petitioners are entitled to disallowed deductions relating to their law firm (law firm deductions); we hold they are not; (2) whether petitioners are entitled to reduce gross receipts from their law firm (law firm gross receipts) reported on their return; we hold they are not; (3) whether Mrs. Mirch was a real estate professional; we hold she was not; (4) whether petitioners are entitled to disallowed deductions relating to Mrs. Mirch's real estate activities; we hold they are not; (5) whether petitioners are entitled to a net operating loss (NOL) deduction; we hold they are not; and (6) whether respondent properly sustained the NFTL filing; we hold he did.

## FINDINGS OF FACT

Petitioners lived in California when they timely filed the Petition.[3] Both petitioners are attorneys. During 2006 they practiced law as Mirch & Mirch in Reno, Nevada. Mr. Mirch has an LLM in taxation and is a certified public accountant. Mrs. Mirch worked part-time at the law firm. She managed the firm's finances, paying the firm's expenses and issued checks. In early April 2006 Mr. Mirch suffered a stroke and had to cut back on his work hours, and Mrs. Mirch increased her work hours and provided services to clients. Despite Mr. Mirch's health issues the firm filed appellate briefs and motions in the second half of 2006. There is no evidence in the record that establishes the number of hours Mrs. Mirch worked on the law firm's business. Petitioners reported the law firm's activities on Schedule C, Profit or Loss From Business. They reported self-employment tax only for Mr. Mirch.

I.    *Real Estate Activities*

During 2006 petitioners owned two rental properties, which we refer to as the Hope Street property in Providence, Rhode Island, and

---

[3] Petitioners failed to propose findings of fact in accordance with Rule 151(e)(3). They also failed to cite the record to support many factual findings or cited exhibits not admitted into the record. Their proposed findings include recitation of testimony and legal and evidentiary arguments. Petitioners' failure to adhere to the Court's Rules significantly impaired respondent's ability to respond to petitioners' proposed findings. After respondent filed his Answering Brief, petitioners filed a document titled Requested Findings of Facts that proposed findings in numbered paragraphs. While the filing assisted the Court, it did not rectify the prejudice caused to respondent from petitioners' failure to adhere to the Court's Rules.

[*3] the Reno property in Reno, Nevada. They did not elect to treat the two rental activities as one activity for purposes of section 469.

Petitioners purchased the Hope Street property in 2004 when their daughter was attending nearby Brown University. They rented the property to students, and their daughter lived there rent free. During 2006 they paid their daughter $500 per month to manage the property while she was a student and also for some months after she graduated and no longer lived at the property. They produced a chart that estimates Mrs. Mirch performed 259 hours of personal services (service hours) on the Hope Street activity during 2006 and Mr. Mirch performed 57 service hours for a combined 316 hours. They did not produce logs of their hours for 2005 and 2007 or produce a log of their daughter's hours for 2006.

The Reno property was a single-family home next door to petitioners' residence during 2006. Petitioners rented out the Reno property as a short-term vacation rental, defined as an average rental period of less than 7 days. *See* Temp. Treas. Reg. § 1.469-1T(e)(3)(ii)(A) (defining a short-term rental). They rented it out approximately 23 times for a total of 93 days during 2006. They advertised a cleaning fee of $80 to $100 per stay in addition to daily rent. Rental invoices show an $85 cleaning fee for most stays. Petitioners hired cleaning and landscaping services.

Petitioners produced a log that estimates Mrs. Mirch worked 944.5 service hours on the Reno activity during 2006. They did not produce a log for 2005 or 2007. The 2006 log identifies three tasks that Mrs. Mirch performed and sets a standardized amount of time for each task as follows: (1) 12 minutes to read an email and 12 minutes to send an email regardless of the length of the emails for a total of 7.4 hours; (2) 7 hours to clean the property after each stay regardless of the length of the stay (which ranged from 1 to 14 days) for a total of 168 hours; and (3) 8 hours of site management and maintenance for each day the property was rented (93 days) for a total of 744.5 hours. The log defines site management as "[o]n call for guests, repairs, supplies, Wi-Fi, cable, snow removal."

Petitioners reported the rental activities on Schedule E, Supplemental Income and Loss. They also filed a second Schedule C reporting Mrs. Mirch engaged in a real estate investment activity. They did not report any income but claimed a home office deduction.

4

II.   *Timeline*

   A.   *Audit and Protest*

Around September 2007 Revenue Agent (RA) Maureen Lytle was assigned to audit petitioners' return for the 2004 taxable year. Later, the Internal Revenue Service (IRS) expanded the audit to include 2005–07.[4]

Petitioners filed their 2006 return under extension on October 15, 2007. They reported tax of $115,660 but did not pay the tax in full with their return. Respondent assessed additions to tax for failure to pay estimated tax under section 6654 and for failure to timely pay tax shown as owed on the return under section 6651(a)(2). Petitioners have made payments toward their unpaid 2006 balance including by levy and the application of overpayment credits from other years.[5] In 2008 petitioners moved from Reno, Nevada, to San Diego, California.

In February 2009, while the audit was ongoing, petitioners filed Form 13683, Statement of Disputed Issues, for 2004–07, which the IRS treated as a written protest of the audit, with the IRS Office of Appeals (Appeals).[6] RA Lytle closed the audit on March 25, 2009. RA Lytle did not prepare a revenue agent's report (RAR). No RAR is in the record. The record includes RA Lytle's workpapers with lead sheets that explain proposed adjustments. On April 27, 2009, RA Lytle prepared Form 5344, Examination Closing Record, for each year under audit and did not enter any adjustments on the Form.

Around May 26, 2009, the protest was assigned to Appeals Officer (AO) Elizabeth Forrest in the Las Vegas, Nevada, Appeals office. AO

---

[4] The IRS did not audit petitioners' return for 2008. Petitioners had unpaid tax for 2008 because they did not pay the tax they reported as owed on their return when they filed it. The IRS assessed late-filing and failure-to-pay additions to tax under section 6651(a)(1) and (2), respectively. Petitioners conceded they are liable for the unpaid 2008 balance.

[5] The IRS issued Notices of Intent to Levy (levy notices) to petitioners for unpaid tax they reported on their 2004, 2006, and 2008 returns. Petitioners did not request CDP hearings for the levy notices. The IRS has levied on petitioners' bank accounts. The timing and propriety of the levies are not at issue. We state facts relating to the levy notices relevant to this case.

[6] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001(a), 133 Stat. 981, 983 (2019). We use the name Office of Appeals because it was in effect for the relevant years.

[*5] Forrest offered to schedule a conference, but petitioners did not respond. Appeals sustained adjustments based on RA Lytle's workpapers and closed the case around June 22, 2010, so a Notice of Deficiency could be issued. Upon closing the Appeals protest, AO Patricia Crawford proposed adjustments that are the basis for the deficiencies determined in the Notice of Deficiency.

B.    *Amended Returns*

In March 2010, while the protest was ongoing, petitioners submitted amended returns for 2005 and 2006 claiming carryback deductions of an NOL of $416,151 from 2007. Respondent reduced the 2007 NOL to $335,081 and allowed petitioners to deduct it for 2005. Respondent determined that petitioners' 2005 taxable income (as adjusted during the audit) completely absorbed the 2007 NOL, and none remained for petitioners to carry back to 2006. *See* § 172(b)(2) (requiring the NOL to be carried back to the earliest allowable year first). Thus, respondent disallowed the claimed NOL deduction for 2006. Around April 11, 2010, petitioners filed a second amended return for 2006 claiming a carryback deduction of an NOL from 2009. Respondent allowed the deduction of the 2009 NOL in its entirety and abated assessed tax for 2006 of $66,710.

C.    *Notice of Deficiency*

On June 29, 2010, the IRS issued a Notice of Deficiency and mailed a separate copy to each petitioner by certified mail to their last known address on Moana Drive, San Diego. *See* Order, *Mirch v. Commissioner*, No. 15305-11 (T.C. Mar. 30, 2012). The U.S. Postal Service (USPS) attempted delivery of the Notice of Deficiency in July 2010, but both copies were unclaimed, and the USPS returned them to the IRS.[7] Respondent determined deficiencies of $142,450 and $99,862 for 2004 and 2006, respectively. He did not determine any penalties. He also explained adjustments he made for 2005 or 2007 that did not result in a deficiency for either year, but the adjustments are relevant to 2006 because they resulted in respondent's disallowing a 2006 deduction for the 2007 NOL. Petitioners did not file a petition with this Court within

---

[7] The IRS's return address on the Notice of Deficiency's mailing envelopes was in Laguna Niguel, California. USPS postmarks on the envelopes show the copies were mailed from Laguna Niguel. However, the case was being considered by the Las Vegas Appeals office, and it was that office that directed issuance of the Notice of Deficiency. As explained further below, the Court has held that the Notice of Deficiency is valid, and the return address has no effect on its validity.

**[\*6]** the 90-day period for review of the Notice of Deficiency. *See* § 6213(a).

On December 20, 2010, the IRS assessed the 2006 deficiency of $99,862 and issued the required written notice of a balance due and demand for payment to petitioners.

D. *Prior Tax Court Case*

On May 16, 2011, the IRS mailed a levy notice for 2004 to petitioners' last known address, 3728 Jennings Street, San Diego. Petitioners did not request a CDP hearing. On June 28, 2011, they filed a petition with this Court contesting, inter alia, the Notice of Deficiency. *See* Petition, *Mirch v. Commissioner*, No. 15305-11 (T.C. June 28, 2011). We held an evidentiary hearing regarding the Notice of Deficiency's validity including its proper mailing. Petitioners admitted that Moana Drive was their last known address when the Notice of Deficiency was mailed. We examined the Notice of Deficiency, the certified mail envelopes, and the USPS Form 3877, Firm Mailing Book For Accountable Mail, for the mailing of the Notice of Deficiency.[8]

Upon the Commissioner's motion, we dismissed the case for lack of jurisdiction on the ground that the petition was not mailed and filed within 90 days of issuance of the Notice of Deficiency. Order, *Mirch v. Commissioner*, No. 15305-11 (T.C. Jan. 7, 2013). We found the record contained "no credible evidence to rebut the presumption of actual mailing." Rather, the envelopes "show[ed] that USPS left notice for each petitioner on June 30, 2010, and again on July 10, 2010, and that USPS ultimately returned the envelopes to the sender as 'unclaimed' on July 16, 2010." On May 19, 2015, the U.S. Court of Appeals for the Ninth Circuit affirmed the dismissal. *Mirch v. Commissioner*, 604 F. App'x 564 (9th Cir. 2015).

E. *Issuance of NFTL Filing Notice and CDP Hearing*

On June 13, 2011, petitioners filed their 2010 return. Unfortunately, on the return they misstated their street number as 3729. Their address was 3728 Jennings Street. According to the record, the 2010 return was the last return petitioners filed before the IRS sent

---

[8] These documents are accessible through the Court's e-filing system. *See* Docket No. 15305-11, Doc. 6 (Mar. 30, 2012).

[*7] notice of the NFTL filing at issue in this CDP case. Accordingly, 3729 Jennings was their last known address.

On January 25, 2013, the IRS prepared Form 668(Y)(c), Notice of Federal Tax Lien, and stated petitioners' residence as 3729 Jennings Street. Around February 1, 2013, the appropriate local government recording office (local recording office) recorded the lien notice.[9] On February 5, 2013, the IRS mailed notice of the NFTL filing to petitioners at 3729 Jennings Street. Petitioners allege they did not receive the notice. However, on the same day the IRS mailed the NFTL filing notice respondent received petitioners' CDP hearing request. In the request petitioners challenged the underlying tax liabilities and the validity of the assessments.[10] They did not request a collection alternative. The CDP hearing was assigned to AO Lynne McDermott in the Las Vegas Appeals office. In June 2013 AO McDermott asked Mrs. Mirch to verify her address and discovered 3729 Jennings was not petitioners' correct address. Mrs. Mirch then requested that respondent use the law firm's address. At petitioners' request the CDP hearing was transferred to the San Diego Appeals office, and Settlement Officer (SO) Teresita Paz was assigned the hearing. She had no prior involvement with petitioners' case.

On December 19, 2013, SO Paz held a CDP hearing. She initially told petitioners they could not challenge their underlying tax liabilities. However, she then consulted with Office of Chief Counsel Attorney Sylvia Shaughnessy, who advised her that petitioners could challenge the underlying tax liabilities because they did not receive the Notice of Deficiency. AO Crawford was assigned to perform an audit reconsideration.[11] She wrote in her case activity record (CAR) that Mrs. Mirch brought unorganized records to their meetings and struggled to find documents, causing AO Crawford to reschedule the meeting. AO Crawford made some concessions following her review of petitioners'

---

[9] It is unclear from the record when the IRS corrected the address error with the lien notice filed with the local recording office.

[10] Petitioners dated the hearing request February 4, 2013. Respondent received a second, substantially identical hearing request on February 13, 2013.

[11] Petitioners complain about delays in their CDP hearing. Their own actions caused significant delays including their requests for multiple postponements, their failures to promptly provide requested documents, and their bringing unorganized records to their CDP hearing and audit reconsideration. There was an approximately one-year delay by SO' Paz's supervisor after she requested assignment of an AO for an audit reconsideration. Throughout the delay, SO Paz followed up with her supervisor multiple times without success.

[*8] documentation, discussed further below, and the IRS abated $6,482 of assessed tax for 2006. By letter dated April 18, 2016, SO Paz notified petitioners of the outcome of the audit reconsideration and requested that petitioners provide updated financial information if they wanted her to consider a collection alternative. Petitioners had previously provided financial information in 2013. They did not update the information by the deadline SO Paz set, and SO Paz closed the case. As part of the CDP hearing SO Paz verified that an assessment was properly made, notice and demand for payment was mailed to petitioners' last known address, and there was a balance due when the NFTL was issued.

On June 21, 2016, respondent issued a Notice of Determination for 2004, 2006, and 2008 sustaining the NFTL filing. Petitioners timely filed a Petition. In their Petition they argued that the Notice of Deficiency is invalid and the assessment is barred by the statute of limitations and is invalid. They also disputed their underlying tax liabilities. At respondent's request we remanded the case to Appeals to address the timeliness of the 2004 assessment. On June 25, 2018, Appeals issued a Supplemental Notice of Determination sustaining the NFTL filing for 2004, 2006, and 2008.

F.    *Validity of the Notice of Deficiency*

On June 16, 2023, the Court granted partial summary judgment to respondent ruling the Notice of Deficiency is valid. We held petitioners are precluded by the doctrine of collateral estoppel from challenging the Notice of Deficiency's validity based on their prior Tax Court case. However, we held there was a genuine issue of material fact concerning the propriety of the assessment because of a notation on Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, that explains the assessment as agreed. The Court also examined a 2015 email in which SO Paz incorrectly wrote that the Notice of Deficiency was mailed to petitioners' last known address in Las Vegas.[12] The Court stated the email "contains no substantive information that might cast doubt on the conclusion compelled by the

---

[12] SO Paz told petitioners incorrect information and/or wrote incorrect information in her CAR about the date the IRS mailed the Notice of Deficiency and the mailing address it used. Petitioners received copies of the Notice of Deficiency and mailing envelopes during their prior Tax Court case. The errors in SO Paz's CAR are immaterial.

[*9] notices, certified mail envelopes, and the Form 3877 that the notice was sent to [petitioners'] last known address."

On June 22 and 23, 2023, we conducted a partial trial and heard evidence on the completeness of the administrative record and petitioners' allegations of bad faith by IRS employees. Thereafter, we informed the parties that we found no showing of bad faith or an incomplete administrative record.[13] By Order dated June 28, 2023, we excluded testimony outside the administrative record with respect to whether Appeals abused its discretion in sustaining the NFTL filing. Petitioners requested a stay because of concerns with an ethical issue regarding self-representation. We granted the stay over respondent's objection. We continued the trial on February 25 and 26, 2025.

III.   *IRS Forms*

   A.   *Form 4340*

Form 4340 for 2006 explains the December 20, 2010, assessment of $99,862, the deficiency determination, as "ADDITIONAL TAX ASSESSED BY EXAMINATION AGREED AUDIT DEFICIENCY PRIOR TO 30 OR 60 DAY LETTER." It does not indicate the IRS made a quick assessment. Form 4340 also reflects that the case was transferred to Appeals on May 18, 2009, for consideration of petitioners' protest. The transfer is explained with the notation "ADDITIONAL TAX ASSESSED BY EXAMINATION AUDIT, CLOSED TO APPEALS PRIOR TO 90 DAY LETTER" and an assessment of zero.

   B.   *Transcript*

Petitioners' transcript also shows the IRS assessed $99,862 on December 20, 2010, using transaction code (TC) 300, and the period of limitations for assessment expired on April 18, 2011, confirming the assessment was timely. TCs are used to maintain a history of actions

---

[13] This case is appealable to the Ninth Circuit, which generally limits our abuse-of-discretion review to the administrative record. *Keller v. Commissioner*, 568 F.3d 710, 718 (9th Cir. 2009), *aff'g in part* T.C. Memo. 2006-166, *and affirming in part, vacating in part* decisions in related cases. However, the Ninth Circuit allows for narrow exceptions when necessary "to plug holes in the administrative record." *Wilson v. Commissioner*, 705 F.3d 980, 991 (9th Cir. 2013) (quoting *Lands Council v. Powell*, 395 F.3d 1019 1030 (9th Cir. 2005)), *aff'g* T.C. Memo. 2010-134. One such exception permits the administrative record to be supplemented when there is a showing of an agency's bad faith. *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012); *Lands Council*, 395 F.3d at 1030.

[*10] relating to a taxpayer's account. Internal Revenue Manual (IRM) 21.2.1.2.4 (Jan. 4, 2012). TC 300 is used to record assessments by the IRS's Examination Division (Exams) or Appeals. IRM Ex. 4.4.1-1 (May 19, 2009) (providing explanations of TCs). The transcript also shows disposal code (DC) 03 in connection with the assessment. DCs are used to identify the type of closing by Exams and are displayed on the transcript as DISP-CD. DC 03 is used when Exams closes an audit as agreed before an RAR is issued. Generally, it reflects an agreed assessment. *Id.*; *see also* IRS Document 6209, IRS Processing Codes and Information. However, Exams did close the audit before RA Lytle issued an RAR because petitioners filed a protest. The transcript shows DC 07 for the transfer of the case to Appeals for consideration of petitioners' protest. DC 07 is used to identify an audit that has been administratively appealed but is not docketed.

IV.    *Return Reporting and Adjustments*

As stated above, taxable years 2005 and 2007 are relevant to petitioners' underlying tax liability for 2006 because respondent made adjustments for each year that affect whether petitioners are entitled to an NOL deduction for 2006.[14]

A.    *2005 Reporting and Adjustments*

Petitioners computed their law firm gross income by reporting settlements paid to their clients as gross receipts and deducting the amounts that they paid over to their clients as returns and allowances. For 2005 petitioners reported gross receipts of $982,632 and returns and allowances of $7,204, resulting in law firm gross income of $975,428. They claimed deductions of $525,774 for law firm net profit of $449,654. In the Notice of Deficiency respondent increased law firm gross receipts by $27,733 and disallowed $17,439 in law firm deductions as follows: (1) $14,891 in health insurance expenses (which respondent allowed as a self-employment health insurance deduction), and (2) $2,548 in travel expenses identified in petitioners' records as ATM withdrawals that petitioners failed to substantiate. These adjustments increased law firm net income by $45,172.

For Mrs. Mirch's real estate investment activity petitioners reported no income and claimed deductions of $12,037 as follows:

---

[14] For 2005–07 respondent made computational adjustments to petitioners' self-employment tax and self-employment adjusted gross income (AGI) adjustment and allowed petitioners part of their disallowed deductions as itemized deductions.

[*11] (1) $11,200 for investment research expenses and (2) $837 for a home office deduction. Respondent disallowed the deductions in their entirety but allowed petitioners to deduct the $837 as itemized deductions.

For the Hope Street and Reno rental activities petitioners claimed deductions of $230,237 and $31,989 and reported rental losses of $226,379 and $29,318, respectively, for a total loss of $255,697. They treated the loss as nonpassive and used it to offset their nonpassive income. Respondent determined that the $255,697 loss was passive.

B.      *2006 Reporting and Adjustments*

Petitioners reported law firm gross receipts of $2,907,093 from which they subtracted $1,844,732 in settlement payments to their clients as returns and allowances and reported law firm gross income of $1,062,361. Respondent determined petitioners understated law firm gross income by $16,033 but conceded this adjustment in the audit reconsideration after petitioners provided substantiation of a $16,000 cash settlement payment to a client.

Petitioners claimed law firm deductions of $599,093. Respondent disallowed $146,913 for failure to substantiate the amount or business purpose of the expenses as follows:

| *Expense* | *Claimed* | *Disallowed* | *Allowed* |
|---|---|---|---|
| Insurance | $16,222 | $16,222 | -0- |
| Pension & profit sharing | 90,500 | 88,000 | $2,500 |
| Travel | 25,439 | 2,544 | 22,895 |
| Charitable contribution | 2,286 | 2,286 | -0- |
| Employee medical | 37,861 | 37,861 | -0- |
| **Total** | 172,308 | 146,913 | 25,395 |

Respondent allowed most travel expense deductions. He disallowed $2,747 in travel expenses that petitioners identified as ATM withdrawals and failed to substantiate. *See* § 274(d) (imposing heightened substantiation requirements for travel expenses).

[*12] Respondent allowed petitioners to deduct part of the disallowed deductions for employee medical expenses and donations elsewhere on their return. He determined petitioners substantiated $14,535 of medical expenses that they incurred to insure their family and allowed a $14,535 self-employed health insurance deduction. He also determined petitioners substantiated $1,090 of the charitable contributions and allowed petitioners to increase their itemized deductions accordingly.

For Mrs. Mirch's real estate investment activity petitioners claimed a $965 home office deduction and reported no income. Respondent disallowed the deduction on Schedule C in its entirety but increased petitioners' itemized deductions by $965.

For the Hope Street and Reno rental activities petitioners reported losses of $88,545 and $32,565, respectively, for a total loss of $121,110. Petitioners treated the loss as nonpassive and used it to reduce their nonpassive income. Respondent determined that the rental losses are passive. Respondent also determined that petitioners failed to substantiate the amounts or business purposes of claimed deductions totaling $73,026 for the Hope Street activity. He allowed the claimed deductions for the Reno activity in their entirety except for $2,822 in depreciation.

C.    *2007 Reporting and Adjustments*

For 2007 petitioners reported a $416,151 loss as their AGI. Respondent increased law firm gross receipts by $8,786 and disallowed law firm deductions of $24,575 as follows: (1) health insurance expenses of $14,100, (2) travel expenses of $2,747 identified as ATM withdrawals, (3) charitable contributions of $3,716, and (4) other expenses of $4,012.[15] In total respondent determined a positive adjustment of $33,361 to law firm net income.

Petitioners reported losses from the Hope Street and Reno rental activities of $40,509 and $22,618, respectively. They also reported a

_____

[15] There are typographical errors in the explanation of adjustments for 2007 attached to the Notice of Deficiency. A chart in the explanation states the correct amounts of the increase in gross receipts and disallowed deductions but miscalculates the total adjustment as $41,928, which is the 2006 adjustment. The narrative portion of the explanation erroneously repeats the increase to gross receipts and the amount of disallowed deductions for 2006. We find these errors are immaterial because they did not mislead petitioners. Moreover, we are providing an independent review of petitioners' 2006 tax liability including the 2007 NOL computation. Accordingly, there is no need to examine the sufficiency of the Notice of Deficiency.

[*13] $9,297 loss from a third rental property for total rental losses of $72,424. There is no information in the record about this third property. They offset $3,605 in royalty income with the rental losses and reported a loss on Schedule E of $68,819. They treated the $68,819 loss as nonpassive and included it in the computation of their 2007 NOL. Respondent determined the $68,819 loss was passive and petitioners could not include it in their 2007 NOL.[16]

Petitioners reported an NOL for 2007 of $416,151. Respondent's adjustments to petitioners' 2007 reporting reduced the 2007 NOL to $335,081 but did not result in a deficiency determination.

## OPINION

I. *Standard of Review*

Where the validity of a taxpayer's underlying liability is properly at issue in a CDP case, we review the tax liability de novo. *Sego v. Commissioner*, 114 T.C. 604, 610 (2000); *Goza v. Commissioner*, 114 T.C. 176, 181–82 (2000). Petitioners did not receive the Notice of Deficiency or otherwise have a prior opportunity to dispute their 2006 tax liability. Accordingly, we review petitioners' 2006 tax liability de novo. *See* §§ 6320(c), 6330(c)(2); *Montgomery v. Commissioner*, 122 T.C. 1, 9 (2004); *Jackson v. Commissioner*, T.C. Memo. 2022-50, at *6. We review all other determinations, i.e., the determination to sustain the NFTL filing, for abuse of discretion. *Sego*, 114 T.C. at 610; *Goza*, 114 T.C. at 182. An abuse of discretion occurs if Appeals' determination is arbitrary, capricious, or without sound basis in fact or law. *See, e.g.*, *Murphy v. Commissioner*, 125 T.C. 301, 320 (2005), *aff'd*, 469 F.3d 27 (1st Cir. 2006); *Taylor v. Commissioner*, T.C. Memo. 2009-27. Because this case would ordinarily be appealable to the Ninth Circuit, we base our decision on whether respondent abused his discretion in sustaining the NFTL filing on the administrative record. *See Keller v. Commissioner*, 568 F.3d at 718.

II. *Petitioners' Underlying Tax Liability*

Deductions are a matter of legislative grace, and taxpayers have the burden of proof to substantiate any deductions claimed. Rule 142(a); *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). Taxpayers may

---

[16] In audit reconsideration respondent allowed petitioners to offset $180 of passive income reported on Schedule E with the rental losses. Petitioners did not report any items for Mrs. Mirch's real estate investment activity for 2007.

**[\*14]** deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business or for the production of income. §§ 162(a), 212. Taxpayers cannot deduct personal, living, or family expenses. § 262.

Taxpayers must keep sufficient records to substantiate the amount and business purpose of each expense and provide the records to the IRS so that it can determine the correct tax liability. *See* § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001); Treas. Reg. § 1.6001-1(a). When a taxpayer presents some credible evidence that provides a rational basis for the Court to estimate the amount of an expense, the Court may estimate the amount under the *Cohan* rule. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930); *see Vanicek v. Commissioner*, 85 T.C. 731, 742–43 (1985). However, the Court is not obligated to make an estimate where there is insufficient evidence to make a rational estimate. *See Norgaard v. Commissioner*, 939 F.2d 874, 879 (9th Cir. 1991) (stating that the Court is not required to guess or estimate), *aff'g in part, rev'g in part* T.C. Memo. 1989-390. The *Cohan* rule does not apply to expenses subject to the heightened substantiation requirements of section 274(d) including the travel expenses at issue in this case.

A.     *2006 Law Firm Deductions*

Respondent argues that petitioners did not properly raise the disallowed law firm deductions in the Petition and we should not consider them. *See* Rule 34(b)(1)(G). Regardless of whether petitioners properly raised the deductions, they did not present sufficient evidence to substantiate the amounts or business purposes of the expenses respondent disallowed. Petitioners produced QuickBooks records, a general ledger, bank statements, and canceled checks. However, these documents do not substantiate any additional amounts of expenses. Petitioners did not testify at trial about the disallowed deductions, and in their Posttrial Briefs they did not direct the Court to documents which substantiated them. Accordingly, we find petitioners are not entitled to the disallowed law firm deductions except to the extent respondent allowed deduction of medical expenses and charitable contributions, as discussed above.

B.     *Law Firm Gross Receipts*

During the audit RA Lytle performed a bank deposits analysis to determine whether petitioners correctly reported their law firm gross

[*15] income. She identified taxable and nontaxable deposits as well as settlement payments to their clients, i.e., returns and allowances. In the Notice of Deficiency respondent determined petitioners underreported their law firm gross income by $16,033. Respondent conceded this adjustment during the audit reconsideration after petitioners presented additional substantiation that shows they made a cash withdrawal of $16,000 to make a settlement payment to a client. The $16,000 settlement payment increased the law firm's returns and allowances and, thus, decreased law firm gross income.

Petitioners also argue RA Lytle failed to account for $340,000 in transfers between two of their bank accounts as nontaxable deposits. They argue the transfers were capital contributions to the law firm. However, RA Lytle did not make a $340,000 adjustment to law firm gross receipts based on her analysis of taxable and nontaxable deposits. Accordingly, if petitioners had $340,000 in nontaxable transfers as they allege, they were the ones who miscalculated law firm gross receipts on their return.

Gross receipts reported on a return are admissions that the taxpayer must overcome by "cogent proof." *Estate of Hall v. Commissioner*, 92 T.C. 312, 337–38 (1989); *see Kohout v. Commissioner*, T.C. Memo. 2022-37, at *9, *aff'd*, No. 23-11135, 2024 WL 3069309 (11th Cir. June 20, 2024). The record does not contain evidence as to how petitioners calculated law firm gross receipts as reported on their return. Accordingly, it is impossible for us to determine whether they erroneously included $340,000 in nontaxable transfers.[17] They have not met the higher standard for overcoming their return reporting by "cogent proof."

III.   *Real Estate Losses*

Section 469 generally limits deductions for passive activity losses to the taxpayer's passive income for the year. § 469(a)(1), (b); *see Lamas v. Commissioner*, T.C. Memo. 2015-59, at *27. A passive activity is any activity that involves the conduct of a trade or business in which the taxpayer does not materially participate (material participation requirement). § 469(c)(1). Passive losses that are disallowed for the taxable year may be carried over to offset passive activity income in

---

[17] Although petitioners assert they had $340,000 in nontaxable transfers that RA Lytle allegedly missed, at times they argue for only a $59,152 downward adjustment to law firm gross receipts. We do not need to resolve this discrepancy because petitioners have not proven they overreported gross income in any amount.

**[\*16]** other years. § 469(a) and (b); *see also* § 469(g) (allowing deduction of suspended passive losses when the taxpayer disposes of his entire interest in the passive activity).

Section 469 provides special rules for real estate activities. The general rule is that real estate activities are passive activities, i.e., any loss from a real estate activity is a passive loss regardless of whether the taxpayer materially participates in the activity. § 469(c)(2). There are two exceptions to this general rule relevant in this case: (1) the taxpayer qualifies as a real estate professional, and (2) the real estate activity is a short-term rental activity. § 469(c)(7); Temp. Treas. Reg. § 1.469-1T(e)(3)(ii)(A). For either exception, the real estate activity is not per se passive. However, taxpayers must satisfy the material participation requirement for the activity to be nonpassive. § 469(c)(7); Temp. Treas. Reg. § 1.469-5T(a). If a taxpayer qualifies under either exception and satisfies the material participation requirement, a loss is nonpassive, and the taxpayer can use the loss to offset nonpassive income.

Respondent determined the rental losses for 2005–07 were passive and disallowed deductions petitioners claimed for the Hope Street and Reno rental activities. Petitioners argue both rental activities were nonpassive because Mrs. Mirch is a real estate professional. Alternatively, they argue the rental loss from the Reno activity is nonpassive because the Reno property is a short-term rental property. We begin by considering whether Mrs. Mirch was a real estate professional.

A.     *Real Estate Professional*

To qualify as real estate professionals, taxpayers must (1) perform more than 50% of their total service hours in all trades and businesses in the real property trades or businesses in which they materially participate (50% test) and (2) spend at least 750 service hours in real property trades or businesses in which they materially participate. *See* § 469(c)(7)(B); *Sezonov v. Commissioner*, T.C. Memo. 2022-40, at \*4–5; *Fowler v. Commissioner*, T.C. Memo. 2002-223, slip op. at 10–11. When applying the 50% test, service hours performed by Mrs. Mirch at the law firm count in her total service hours in all trades or businesses. *See* Treas. Reg. § 1.469-9(b)(4).

Mrs. Mirch must materially participate in the rental activities to qualify as a real estate professional. Material participation is determined separately for each rental activity unless the taxpayer

**[\*17]** makes an election to treat all interests in real estate as a single activity. § 469(c)(7)(A); Treas. Reg. § 1.469-9(e)(1), (g)(3). Taxpayers make the election by filing a statement with their return declaring they are making an election under section 469(c)(7)(A). See *Trask v. Commissioner*, T.C. Memo. 2010-78, slip op. at 11 (stating taxpayers must make an explicit election on their return); Treas. Reg. § 1.469-9(g)(3). Reporting multiple rental activities on the same Schedule E is not sufficient to make the election. *Trask*, T.C. Memo. 2010-78, slip op. at 12. Petitioners did not elect to aggregate the Hope Street and Reno activities as a single activity. Accordingly, Mrs. Mirch must satisfy the material participation requirement separately for each activity.

Material participation requires the taxpayer's regular, continuous, and substantial involvement in the activity. § 469(h)(1). Taxpayers are considered to materially participate if they satisfy one of seven regulatory tests. Temp. Treas. Reg. § 1.469-5T(a); *see Akers v. Commissioner*, T.C. Memo. 2010-85. Petitioners contend Mrs. Mirch materially participated in both rental activities. However, they did not identify which of the seven regulatory tests she had satisfied. Respondent argues that Mrs. Mirch did not satisfy any of the seven regulatory tests but addresses only one test that requires (1) that the taxpayer participate in the activity for more than 100 hours during the tax year and (2) that her participation not be less than the participation in the activity by any other individual (including individuals who are not owners of the property).[18] Temp. Treas. Reg. § 1.469-5T(a)(3). He argues that Mrs. Mirch did not satisfy either part of this two-part test.

For purposes of the material participation requirement, taxpayers can use any reasonable means to substantiate their approximate number of service hours and the types of service performed including "appointment books, calendars, or narrative summaries."

---

[18] We have considered the six other regulatory tests and find that petitioners have not established Mrs. Mirch materially participated under any of them. The other six tests are: (1) the taxpayer participates for more than 500 hours during the year; (2) her participation constitutes substantially all of the participation of all individuals (including nonowners) for the year; (3) the activity is a significant participation activity for the year and the taxpayer's aggregate participation in all significant participation activities during the year exceeds 500 hours; (4) the taxpayer materially participated in the activity for any 5 years (whether or not consecutive) during the 10 immediately preceding years; (5) the activity is a personal service activity, and the taxpayer materially participated in the activity for any 3 years (whether or not consecutive) preceding the year; and (6) based on all the fact and circumstances, the taxpayer participates in the activity on a regular, continuous, and substantial basis during the year. Temp. Treas. Reg. § 1.469-5T(a).

[*18] *Id.* para. (f)(4). They are not required to present contemporaneous daily time reports. *Id.* However, a "ballpark guesstimate" of hours is not enough. *Moss v. Commissioner*, 135 T.C. 365, 369 (2010); *Balocco v. Commissioner*, T.C. Memo. 2018-108, at *21; *Bailey v. Commissioner*, T.C. Memo. 2001-296, slip op. at 13–14.

### B. *Reno Activity*

We begin by considering whether Mrs. Mirch materially participated in the Reno activity.[19] Petitioners presented an undated log that shows Mrs. Mirch performed 944.5 service hours on the Reno activity. The log is in summary form and lists a standardized time estimate for three tasks that Mrs. Mirch allegedly performed: emails, cleaning, and onsite management.

The log estimates that Mrs. Mirch spent 12 minutes reading each email received and 12 minutes sending each email for a total of 7.4 hours during 2006 regardless of the length of the emails. Mrs. Mirch advertised the property through rental websites and responded to emails from prospective tenants. She produced substantiation that sufficiently establishes to our satisfaction the number of emails that she sent and received. We find 7.4 hours reasonable for this task.

The log estimates that Mrs. Mirch spent 7 hours cleaning the property after each stay for a total of 168 hours. Respondent disagrees with the 168 hours estimate. He questions whether Mrs. Mirch cleaned the property because petitioners deducted nearly $10,000 of cleaning and maintenance expenses on Schedule E. He also questions whether 168 hours is an accurate estimate for cleaning, noting Mrs. Mirch estimated 7 hours for cleaning regardless of the length of stay, which ranged from 1 to 14 days. Moreover, petitioners charged the renters a cleaning fee separate from the daily rent. We agree with respondent that petitioners' own records and reporting call into question the accuracy of the 168-hour estimate. Petitioners deducted nearly $10,000 for professional cleaning services for 2006. Nor do we find credible Mrs. Mirch's testimony that she cleaned the house after each stay. It is likely Mrs. Mirch performed minimal hours of cleaning. The estimated cleaning hours are nothing more than a postevent ballpark estimate,

---

[19] There is no evidence Mr. Mirch worked on the Reno activity. *See* § 469(h)(5) (allowing taxpayers to count both spouses' hours for purposes of the material participation requirement). Mr. Mirch's hours would not count for the 750-hour requirement to be a real estate professional. § 469(c)(7)(B); *Oderio v. Commissioner*, T.C. Memo. 2014-39, at *5–6; Temp. Treas. Reg. § 1.469-5T(f)(3).

**[\*19]** and the estimate is not sufficient to substantiate Mrs. Mirch's hours. *See Moss*, 135 T.C. at 369.

Finally, we find the 8 hours of site management per rental day unreasonable and do not count the 744 hours assigned to this task toward Mrs. Mirch's hours for material participation. Petitioners counted 8 hours per rental day simply because Mrs. Mirch was available if a tenant needed her. However, only the actual time spent on a rental activity is counted for purposes of the material participation requirement. *See Pohoski v. Commissioner*, T.C. Memo. 1998-17, slip op. at 22. We acknowledge Mrs. Mirch likely performed some tasks during a tenant's stay. However, there is no means for us to reasonably estimate the hours she spent on these tasks based on the documents in the record or her testimony.

We would need to assign close to one hour per rental day to site management for Mrs. Mirch to reach the required 100 hours. The record does not support such an estimate, however, because Mrs. Mirch failed to maintain records and did not testify credibly about her hours. *See Merino v. Commissioner*, T.C. Memo. 2013-167, at \*8–12 (finding the taxpayer failed to provide evidence to support reliability of time summary); *Rapp v. Commissioner*, T.C. Memo. 1999-249, slip op. at 10–11 (discounting testimony that lacked specifics about when the work was performed). While records need not be contemporaneous, they must be a reasonable means to establish the taxpayer's hours. *Moss*, 135 T.C. at 369. The use of a "'postevent' ballpark guesstimate" is not permitted. *Fowler*, T.C. Memo. 2002-223, slip op. at 15. The log is undated and appears not to be a contemporaneous record. Rather, it was likely created to reach the 750 hours required to qualify as a real estate professional, which Mrs. Mirch is not.

In conclusion, the summary method that Mrs. Mirch used to estimate her hours for the Reno activity is far from reasonable. *See* Temp. Treas. Reg. § 1.469-5T(f)(4) (requiring reasonable means). The log does not accurately reflect the number of hours Mrs. Mirch participated in the activity and is not reliable. The log indicates greatly exaggerated, standardized hours for cleaning and site management. Petitioners have not established Mrs. Mirch performed 100 service hours in the Reno activity, and thus she did not materially participate in it. Accordingly, her hours attributable to the Reno activity do not count for the 750-hour requirement to be a real estate professional. There is no need to decide

[*20] whether Mrs. Mirch met the second requirement for a real estate professional, the 50% test.[20]

### C. *Hope Street Activity*

Petitioners presented a chart that estimates Mrs. Mirch performed 259 service hours on the Hope Street activity and Mr. Mirch performed 57 service hours for a total of 316 hours. *See* § 469(h)(5); Treas. Reg. § 1.469-9(c)(4). It is likely petitioners exaggerated the hours. The property was across the country from where they lived, and they paid their daughter to manage it. However, assuming the hours are accurate, they are far fewer than the 750 hours required for Mrs. Mirch to qualify as a real estate professional.[21] Accordingly, we do not need to examine the accuracy of the alleged hours or determine whether she materially participated in the Hope Street activity.[22] Mrs. Mirch was not a real estate professional with respect to the Hope Street activity during 2006.

Mrs. Mirch's status as a real estate professional during 2005 and 2007 is relevant for purposes of the 2006 NOL deduction. Petitioners treated the rental losses for 2005 and 2007 as nonpassive and carried back their 2007 rental losses as part of the NOL deductions they claimed for 2005 and 2006. Respondent argues the 2005 and 2007 rental losses were also passive and determined that petitioners could not use their 2005 rental losses to offset their 2005 nonpassive income, resulting in an increase in their 2005 taxable income, which in turn absorbed more of the 2007 NOL (which respondent also decreased by excluding the passive rental losses from the calculation of petitioners' 2007 NOL). Petitioners did not present any evidence of the number of hours they performed service in either rental activity during 2005 or 2007.

---

[20] The hours Mrs. Mirch worked at the law firm are relevant to the 50% test. However, petitioners did not state how many hours she worked on law firm business or provide any evidence. Accordingly, there would be no basis for us to determine that she worked fewer hours for the law firm than on the rental activities for purposes of the 50% test.

[21] Similarly, even if we assumed that Mrs. Mirch materially participated in both the Reno and Hope Street activities, petitioners' service hours in the Reno activity (fewer than 100) and the Hope Street activity (allegedly 316) are fewer than the required 750 hours.

[22] Petitioners failed to adequately address the second requirement for material participation, whether Mrs. Mirch performed more services than any other individual. There is no means for us to determine, based on the record, that Mrs. Mirch met this requirement.

**[\*21]** Accordingly, we find Mrs. Mirch was not a real estate professional during 2005 or 2007.

### D.     *Short-Term Rental of Reno Property*

As an alternative argument, petitioners argue that the Reno activity is not a passive activity under the short-term rental rules. The parties agree that the Reno property was a short-term rental property during 2006. However, they disagree over whether Mrs. Mirch materially participated in the Reno activity.

A short-term rental activity is not automatically treated as passive. Temp. Treas. Reg. § 1.469-1T(e)(3)(ii)(A) (excluding short-term rentals from the definition of a rental activity). Thus, taxpayers must satisfy the material participation requirement for the short-term rental activity to be nonpassive. *See* § 469(c)(7); Temp. Treas. Reg. §§ 1.469-5T(a), 1.469-1T(e)(3)(ii)(A). As stated above, Mrs. Mirch did not materially participate in the Reno activity. Accordingly, the loss from the Reno activity does not qualify as a nonpassive loss under the short-term rental rules. The loss is passive and deductible only to offset petitioners' passive income.

### E.     *Conclusion*

The Hope Street and Reno rental activities are passive activities.[23] Petitioners' rental losses are subject to the passive loss limitations imposed by section 469, and petitioners cannot use them to offset their nonpassive income. In addition to determining the rental losses were passive, respondent disallowed deductions of $70,429 and $2,822 for the Hope Street and Reno activities, respectively. Petitioners did not present any substantiation for the disallowed expenses. Accordingly, the amount of their passive loss is reduced for the disallowed amount. As we held the rental losses are passive, the disallowed deductions have no impact on petitioners' 2006 tax liability.

## IV.     *NOL Deduction*

Section 172 permits taxpayers to deduct NOLs. An NOL is the excess of the taxpayer's allowable deductions over its gross income with certain modifications. § 172(c) and (d). An NOL must be carried back to the earliest allowable year first; taxpayers could carry back NOLs

---

[23] We also find petitioners' activities with respect to the third property they owned in 2007 are passive.

**[\*22]** incurred in 2007 for two years. § 172(b)(1) and (2). The taxpayer bears the burden of establishing the existence and amount of the NOL. Rule 142(a); *see Keith v. Commissioner*, 115 T.C. 605, 621 (2000). As part of this burden, the taxpayer must establish that the NOL was already not fully absorbed for another year. § 172(b)(2), (c); *Deutsch v. Commissioner*, T.C. Memo. 2012-318, at \*14. A return is not sufficient to substantiate the NOL reported on that return. *Davison v. Commissioner*, T.C. Memo. 2023-139, at \*18, *aff'd*, No. 24-9000, 2025 WL 827693 (10th Cir. Mar. 17, 2025); *see Sparkman v. Commissioner*, 509 F.3d 1149, 1156–57 (9th Cir. 2007), *aff'g* T.C. Memo. 2005-136.

Petitioners reported an NOL of $416,151 on their 2007 return. Respondent reduced the NOL to $335,081 and allowed petitioners to deduct the NOL for 2005. Because of respondent's adjustments for petitioners' 2005 taxable year, respondent determined the 2007 NOL was fully absorbed for 2005, and none remained for petitioners to deduct for 2006. Thus, he disallowed the claimed 2006 NOL deduction in its entirety. Accordingly, we must consider issues relating to petitioners' 2005 and 2007 taxable years to determine whether petitioners are entitled to an NOL deduction for 2006. We have jurisdiction to consider facts and issues for nondetermination years, i.e., the original year of the loss, where they are relevant in a CDP case in which the taxpayer's underlying liability is at issue.[24] *See Barker v. Commissioner*, T.C. Memo. 2018-67, at \*13, *aff'd*, 853 F. App'x 571 (11th Cir. 2021).

A.    *2007 NOL*

We begin by determining the amount of petitioners' 2007 NOL. Respondent decreased the 2007 NOL from $416,151 to $335,081 primarily on the basis of adjustments to petitioners' reporting for the law firm and the determination that the rental losses are passive losses. Petitioners did not present any evidence to substantiate proper computation of their law firm gross receipts or to substantiate the disallowed deductions. Nor did they establish that the rental losses were nonpassive. Petitioners failed to substantiate that they incurred an

---

[24] Respondent argues we should not consider the NOL deduction because petitioners failed to raise it during the CDP hearing or in the Petition. We find petitioners sufficiently raised the NOL deduction and respondent was aware of the issue long before trial. In their Status Report filed on November 29, 2021, petitioners identified the NOL deduction as a possible issue, and respondent identified it as an issue in his Pretrial Memorandum filed on May 30, 2023. Moreover, AO Crawford should have considered the NOL deduction in her audit reconsideration, but it seems she did not request related documentation.

[*23] NOL for 2007 greater than $335,081, the amount determined by respondent.

B.    *2005 Taxable Income*

Respondent determined petitioners underreported law firm gross receipts, and he disallowed law firm deductions for 2005. He also argues petitioners' 2005 rental losses were passive and petitioners cannot use them to offset their 2005 nonpassive income. These adjustments increased petitioners' 2005 taxable income and caused their adjusted 2007 NOL to be completely absorbed for their 2005 taxable year. First, petitioners have not provided any substantiation for the disallowed law firm deductions, and we find petitioners have conceded them. Second, petitioners have not established that the 2005 rental losses are nonpassive losses. Accordingly, we find they were passive and petitioners cannot use them to offset their 2005 nonpassive income. Both adjustments increased petitioners' 2005 taxable income.

Finally, we turn to law firm gross income. Respondent increased gross receipts by $8,786. However, petitioners argue they overreported law firm gross income by $163,762 and underreported their returns and allowances by $104,333. This alleged incorrect reporting meant that petitioners overreported law firm net income by $268,095. If correct, these adjustments would decrease petitioners' 2005 taxable income and mean their 2005 taxable year would not have fully absorbed the 2007 NOL. However, petitioners have not presented any evidence to substantiate the alleged mistakes in their reporting. Instead, they rely on RA Lytle's workpapers.

Petitioners reported law firm gross income of $975,428 for 2005. According to petitioners, RA Lytle's workpapers state they had "legal income" of $811,666. They argue the difference, $163,762, represents overreported gross income. Petitioners cannot rely on vague information from RA Lytle's alleged workpapers to establish that they overreported law firm gross income. We are conducting an independent review of petitioners' tax liability, and petitioners must present evidence they overreported their gross income. *See Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974) (holding the Court will not look behind a notice of deficiency). They have not. We find petitioners have not established they overreported their gross income for 2005.

Petitioners also argue RA Lytle determined they omitted a $104,333 settlement payment from their reported returns and

**[\*24]** allowances. They argue RA Lytle mistakenly increased returns and allowances by $97,129 instead of the full $104,333 and argue we should increase returns and allowances for the difference. This adjustment would decrease law firm net income by $7,204. However, it is clear from the Notice of Deficiency that respondent did not make any adjustments to petitioners' 2005 returns and allowances. Moreover, petitioners failed to substantiate a $104,333 settlement payment during the trial. Again, they cite only RA Lytle's alleged workpapers and do not cite any substantiation in the record for the payment, and we have found none.

We find respondent properly increased petitioners' 2005 taxable income. This adjustment along with respondent's other adjustments for 2005 mean petitioners' 2007 NOL (as determined by respondent) was completely absorbed for 2005.

V.    *Abuse of Discretion*

We review Appeals' determination to sustain the NFTL filing for abuse of discretion. In deciding whether Appeals abused its discretion, we consider whether Appeals (1) properly verified that the requirements of applicable law or administrative procedure have been met, (2) considered any relevant issues that petitioners raised, and (3) weighed whether "any proposed collection action balances the need for the efficient collection of taxes with [petitioners'] legitimate concern . . . that any collection action be no more intrusive than necessary." §§ 6330(c)(3), 6320(c). Our review of the record establishes Appeals satisfied all three requirements.

A.    *Verification*

Before issuance of a Notice of Determination, Appeals must verify that all requirements of any applicable law or administrative procedure have been met. § 6330(c)(1). We have authority to review whether Appeals satisfied the verification requirement regardless of whether the taxpayer raised the issue at the CDP hearing. *See Hoyle v. Commissioner*, 131 T.C. 197, 200–03 (2008), *supplemented by* 136 T.C. 463 (2011). Appeals must verify an assessment was properly made, the IRS issued a notice and demand for payment, and the taxpayer failed to pay. *See Dinino v. Commissioner*, T.C. Memo. 2009-284, slip op. at 17–18. The AO is not required to rely on a particular document to satisfy the verification requirement. *Roberts v. Commissioner*, 118 T.C. 365, 371 n.10 (2002), *aff'd per curiam*, 329 F.3d 1224 (11th Cir. 2003); *Best v.*

**[\*25]** *Commissioner*, T.C. Memo. 2014-72, *aff'd*, 702 F. App'x 615 (9th Cir. 2017). Nor does it require the AO to provide the taxpayer with a copy of the verification. *See* § 6330; Treas. Reg. § 301.6330-1(e)(1); *see also Nestor v. Commissioner*, 118 T.C. 162, 166 (2002). In the Attachment to the Notice of Determination, SO Paz wrote that she verified the assessment, proper issuance of the notice and demand and the notice of NFTL filing, and a balance due.[25] SO Paz wrote that "[t]he NFTL appear[s] to be the most appropriate manner in which to resolve this matter as Appeals was unable to consider any alternatives. The NFTL balanced the efficient collection of tax with your legitimate concern that any collection action be no more intrusive than necessary."

Petitioners raise four issues with SO Paz's verification. They argue that (1) the IRS mailed the required notices, including the Notice of Deficiency, the notice and demand for payment, and the notice of NFTL filing, to the wrong address, (2) the assessment was untimely, (3) the IRS records show there was an irregularity with the assessment. rendering it invalid, and (4) the NFTL was backdated.

### 1. *Incorrect Address of Notices*

#### a. *Notice of Deficiency*

By Order dated June 16, 2023, we held that petitioners could not challenge the mailing address used for the Notice of Deficiency under the doctrine of collateral estoppel because they admitted that it was mailed to their last known address in the case at Docket No. 15305-11. We repeatedly explained to petitioners at trial that this issue had been decided and would not be relitigated. Nevertheless, they persisted at trial and in their posttrial briefs in advancing numerous arguments challenging the existence of the Notice of Deficiency, its issuance date, and evidence of its mailing, all of which we previously considered and ruled on. Rather than presenting evidence or argument to establish their 2006 tax, they focused on meritless arguments that respondent's counsel fabricated or altered mailing envelopes for the Notice of Deficiency, reconstructed it, destroyed and lost evidence, and created dummy files, and that IRS employees targeted them and falsified their

---

[25] Petitioners object to Ms. Shaughnessy's review of the Supplemental Notice of Determination before its issuance. Her review is not only allowable but also advisable to ensure the Supplemental Notice satisfies the Court's remand order.

**[*26]** account information in the IRS's electronic database to show the Notice of Deficiency was timely issued.[26]

Petitioners have unnecessarily complicated and prolonged resolution of this case with baseless arguments. The evidence shows the audit was warranted. It is readily apparent from our review of the record that petitioners improperly deducted personal and capital expenses for multiple years and significantly underreported their tax liabilities by claiming rental losses were passive.

### b. *Notice and Demand for Payment and NFTL*

We also hold the notice and demand for payment and the notice of the NFTL filing were mailed to petitioners' last known address, 3729 Jennings Street. Within 60 days of making an assessment, the IRS must provide a notice of the tax due and demand for payment at the taxpayer's dwelling or last known address. § 6303(a). The IRS mailed the required notice on the same day it made the assessment and satisfied this requirement. Moreover, because petitioners misstated their address on their most recently filed return, 3729 was their last known address when the two notices were mailed even though they resided at 3728 Jennings Street. Finally, we find petitioners timely received the notices and they timely filed the CDP hearing request.

### 2. *Validity of Assessment*

Generally, the Commissioner has three years to assess tax after a taxpayer files a return. § 6501(a). The three-year period is suspended for 90 days after a Notice of Deficiency is issued, and, if no petition is timely filed, for an additional 60 days thereafter. §§ 6503(a)(1), 6213(a). When the three-year period has been suspended by the issuance of a Notice of Deficiency, any days remaining from the three-year period are tacked onto the 150 days. *See, e.g.*, *Ripley v. Commissioner*, 105 T.C. 358, 362–63 (1995), *rev'd on other grounds*, 103 F.3d 332 (4th Cir. 1996); *Bales v. Commissioner*, 22 T.C. 355, 358–59 (1954).

Petitioners argue that the limitations period for 2006 expired on October 15, 2010. This is incorrect. Petitioners filed their 2006 return on October 15, 2007, which started the limitations period. The IRS timely mailed the Notice of Deficiency on June 29, 2010, suspending the limitations period for 150 days. Respondent calculates 110 days

---

[26] During petitioners' prior case, the Court asked Ms. Shaughnessy if she altered the Notice of Deficiency. She testified she did not, and we found her credible.

**[\*27]** remained in the limitations period when he issued the Notice of Deficiency. Accordingly, petitioners' transcript reflects the limitations period expired on April 18, 2011, based on tacking the 110 days to the 150 days. Accordingly, the December 20, 2010, assessment was well before the limitations period expired.[27]

### a. *Alleged Error on Form 4340 and Transcript*

Form 4340 and a taxpayer's transcript are presumptive evidence a tax was validly assessed, absent a showing of irregularity in the assessment procedure. *United States v. Zolla*, 724 F.2d 808, 810 (9th Cir. 1984); *Davis v. Commissioner*, 115 T.C. 35, 40–41 (2000); *Roberts v. Commissioner*, T.C. Memo. 2004-100, slip op. at 18. Petitioners argue there are irregularities on both Form 4340 and their transcript that invalidate the assessment. They did not raise this issue during the CDP hearing. However, the Court will consider it because it involves whether the SO properly completed the verification requirement.

The notation on petitioners' Form 4340 explains the assessment is the result of an agreed audit deficiency before an RAR was issued. Petitioners' transcript shows the IRS assessed the tax using TC 300, which records an assessment by Exams or Appeals, and DC 03, which generally indicates an agreed assessment before an RAR is issued. Petitioners argue Form 4340 and the transcript are incorrect because they did not agree to the audit adjustments. Respondent admits petitioners did not agree to the deficiency and the assessment followed a defaulted Notice of Deficiency. However, we are not convinced that either Form 4340 or the transcript contains an error. Neither party introduced evidence to explain how the IRS assesses tax from a defaulted Notice of Deficiency or to explain the meaning of the codes and numbers on petitioners' transcript.[28] *See Barnes v. Commissioner*, T.C.

---

[27] Respondent asserts incorrectly that the IRS made a quick assessment for 2006. There is no evidence in the record of a quick assessment. Respondent mistakenly cites evidence of a 2004 quick assessment. Form 4340 for 2006 does not show a quick assessment. Moreover, if a quick assessment had been requested for 2006 on November 17, 2010, when the 2004 quick assessment was requested, the IRS would not have made the 2006 quick assessment according to IRS procedures because there were over 100 days remaining on the limitations period. *See* IRM 4.4.25.2.2 (Feb. 8, 1999) (requiring quick assessment when the limitations period will expire within 60 days).

[28] According to our review of the IRM, the IRS may assess tax from a defaulted Notice of Deficiency as an agreed assessment. The IRS has TCs to assess tax based on the taxpayer's reporting (TC 290) or an audit (TC 300). It does not seem to have a separate TC to assess tax after a defaulted Notice of Deficiency. *See* IRM Ex. 4.4.1-1.

**[\*28]** Memo. 2010-30, slip op. at 10–11 ("Many of the documents in the administrative file and most of the documents labeled as transcripts . . . are full of abbreviations, alphanumeric codes, dates, and digits that are indecipherable and unintelligible without additional explanation."). We do not need to decide whether they contain errors. Rather, assuming there are errors on both documents, we must decide whether petitioners were prejudiced by the errors. We hold they were not.

*Call v. Commissioner*, T.C. Memo. 2005-289, *aff'd*, 230 F. App'x 758 (9th Cir. 2007), is directly on point. In that case, Form 4340 explained the assessment was the result of an "agreed audit deficiency prior to 30 or 60 day letter" when it was based on a defaulted Notice of Deficiency. *Id.*, slip op. at 17 n.3. The Court held the error was merely a labeling error and "d[id] not affect the existence of valid, unsatisfied assessments." *Id.* at 17 & n.3. It also found that "other entries on the Form 4340 clarify the factual circumstances" of the assessment. *Id.* at 17 n.3; *see also Conway v. Commissioner*, 137 T.C. 209, 217 (2011) (holding a mislabeling of a quick assessment as a jeopardy assessment on Form 4340 did not invalidate the assessment because the error did not prejudice the taxpayer), *aff'd sub nom. Nakano v. Commissioner*, 552 F. App'x 724 (9th Cir. 2014); *McCall v. Commissioner*, T.C. Memo. 2009-75 (same labeling error on a transcript).

Petitioners have not presented any evidence to establish they were prejudiced by the alleged errors on Form 4340 or the transcript. They allege respondent concealed the assessment by inputting it as an agreed audit deficiency. They have presented no credible evidence of concealment. In fact, the IRS issued the required notice and demand for

Other parts of the IRM treat a defaulted Notice of Deficiency as an agreed case. *See, e.g.*, IRM 8.21.2.5.1 (Feb. 2, 2007). Conversely, the IRM uses "unagreed amount" to refer to tax being appealed or petitioned. *See* IRM Ex. 4.4.1-1. It is not clear to us from the record that the IRS uses "unagreed amount" for tax assessed from a defaulted Notice of Deficiency.

Similarly, use of DC 03 also seems correct. DC 03 is used to indicate that Exams closed an audit before an RAR was issued. That is what occurred here. RA Lytle did not issue an RAR because petitioners filed a protest before she finished the audit. Appeals proposed the adjustments to petitioners' reporting, not RA Lytle, although Appeals may have relied in part on RA Lytle's workpapers. Arguably, use of DC 03 may be correct even though it generally means an agreed adjustment. Moreover, according to the IRM, when Exams places a DC on an account, it will remain on the account even after the case is transferred and closed by Appeals. IRM Ex. 4.4.1-1. Appeals has separate "closing codes" to designate the type of closing action taken by Appeals. IRM Ex. 8.20.7-1 (Nov. 2, 2007). Finally, we note that petitioners' transcript indicates the audit ended on the date the IRS assessed the tax with TC 421.

**[\*29]** payment to petitioners on the same day it assessed the tax. *See Conway*, 137 T.C. at 217. Accordingly, we find they were not prejudiced and there is no reason to invalidate the assessment. Moreover, the record clarifies that the assessment was made pursuant to a defaulted Notice of Deficiency.

Moreover, the information required on a record of the assessment is correctly stated on Form 4340 and the transcript. The IRS must provide a "copy of the record of the assessment" to the taxpayer upon request. § 6203. The Treasury regulations specify that the record of the assessment must include the "pertinent parts of the assessment," which the regulations identify as the taxpayer's name, the date of assessment, the character of the liability assessed, the taxable period, and the amount assessed. Treas. Reg. § 301.6203-1. Petitioners' Form 4340 and transcript correctly provide all this information. *See Tornichio v. Commissioner*, T.C. Memo. 2002-291, slip op. at 12; *see also Nicklaus v. Commissioner*, T.C. Memo. 2005-156, slip op. at 12–13 (finding an assessment valid where Form 4340 misspelled the taxpayer's first name), *aff'd*, 202 F. App'x 171 (9th Cir. 2006); *Dalton v. Commissioner*, T.C. Memo. 2005-7, slip op. at 5–6, 11 n.4 (involving a case where the Court had remanded to Appeals to correct significant numerical errors on Form 4340 where another part of Form correctly listed the amount of tax assessed).

Under the Code and regulations, the IRS is not required to furnish an explanation of the basis for the assessment. Thus, petitioners received the correct information required by section 6203 and the accompanying regulations. Any error on Form 4340 or the transcript relating to the reason for the assessment was harmless. Accordingly, SO Paz properly verified that all requirements of applicable law and administrative procedures were satisfied even if there were errors on Form 4340 and the transcript.

b.    *Backdated Lien Filing*

Petitioners argue the IRS backdated the Form 668(Y)(c). There is no evidence of backdating. Rather, petitioners' argument shows they misunderstand the law and the mechanics of lien filings and taxpayer notices. First, under the Code a lien in favor of the United States arises automatically. *See* § 6321; *Kestin v. Commissioner*, 153 T.C. 14, 22 (2019). However, the lien is not valid against third parties until the IRS files an NFTL. § 6323(a) (authorizing the IRS to file notice of the tax lien); *Wadleigh v. Commissioner*, 134 T.C. 280, 290 (2010). The IRS

[*30] executed Form 668(Y)(c) to file the NFTL on January 25, 2013. After execution, the IRS submitted the Form to the appropriate state or local recording office for filing. See § 6323(f)(1) (providing that the NFTL shall be filed in a place designated by state law).

The record does not reflect the date the IRS submitted Form 668(Y)(c) to the local recording office. However, there is no statutory or regulatory requirement that the IRS file the NFTL with the recording office on the date the IRS executes it. Filing does not necessarily occur on the day the IRS submits the Form. It is the responsibility of the recording office to file the NFTL Form 668(Y)(c). *See* IRM 5.12.6.3.6(1)(b) (Oct. 14, 2013) (stating the IRS policy is to issue a notice of NFTL filing based on an estimated date the NFTL was filed).

Moreover, the date of submission is immaterial under the Code. What matters is the date the recording office filed the NFTL. Section 6320(a)(2) requires the IRS to provide written notice of the NFTL filing at the recording office not more than five business days after the day of that filing. The local recording office filed the NFTL on February 1, 2013, and the IRS timely issued the required notice on February 5, 2013.[29] Accordingly, the IRS timely issued the notice within five days of the NFTL's filing. There is no evidence of backdating.

B.  *Issues Petitioners Raised*

During the CDP hearing petitioners raised their 2006 tax liability. Appeals provided an audit reconsideration, and we provided an independent review of petitioners' tax liability and allowed them to provide testimony and documentation to establish their correct tax. Over respondent's objections, we considered law firm gross receipts and the 2006 NOL deduction, and adjustments for 2005 and 2007 to the extent they affect petitioners' claimed 2006 NOL deduction.[30] We have considered the income adjustments and disallowed deductions and all evidence petitioners introduced. Petitioners did not raise any issues relating to spousal defenses, challenges to the appropriateness of the collection action, and proposed collection alternatives. *See* § 6330(c)(2)(A). They failed to provide updated financial information SO Paz requested after the audit reconsideration. We find Appeals properly considered all issues petitioners raised. Petitioners have been given

---

[29] Despite filing a CDP hearing request for review of the NFTL, Mr. Mirch claimed at trial that he was not aware of the lien until 2018 or 2019.

[30] Despite respondent's arguments to the contrary, we find petitioners sufficiently raised these issues, but we agreed with respondent's adjustments.

**[\*31]** sufficient opportunities to present evidence and to challenge their underlying tax liability for 2006.

### C. *Balancing of Petitioners' Concerns*

We find SO Paz properly balanced the need for efficient collection with petitioners' legitimate concerns about the intrusiveness of the NFTL filing.[31] *See* § 6330(c)(3)(C). There is no evidence in the record petitioners challenged the intrusiveness of the NFTL filing. SO Paz wrote that "[t]he NFTL appear[s] to be the most appropriate manner in which to resolve this matter as Appeals was unable to consider any alternatives. The NFTL balanced the efficient collection of tax with your legitimate concern that any collection action be no more intrusive than necessary."

### D. *Conclusion*

In conclusion, Appeals did not abuse its discretion by sustaining the NFTL filing for 2006, and we sustain Appeals' determination.

## VI. *Petitioners' Other Arguments*

Petitioners argue the Notice of Deficiency failed to state respondent's deficiency determination for 2005 and respondent's 2005 deficiency determination does not appear on the face of the Notice of Deficiency as required by *Scar v. Commissioner*, 814 F.2d 1363, 1367 (9th Cir. 1987), *rev'g* 81 T.C. 855 (1983). However, respondent did not determine a deficiency for 2005 (or 2007). Rather, he made adjustments to petitioners' reporting for 2005 that increased their taxable income, causing 2005 to completely absorb the 2007 NOL. We have considered petitioners' underlying tax liability for 2005 to the extent it is relevant to the 2006 NOL deduction.

Petitioners also assert they have overpayments for 2004 and 2005 that should be credited toward their 2006 tax. They calculated overpayments for 2004 and 2005 of $19,588 and $31,015, respectively. They assert they are owed refunds of $27,798 and $19,669 for 2005 and 2006, respectively. Petitioners' Form 4340 and transcript for 2016 show the IRS credited overpayments from 2005 totaling $9,865 to 2006 as well as other payments and an overpayment from 2009. Petitioners have not

---

[31] Petitioners argue Appeals unfairly required them to submit a 20% downpayment with an offer-in-compromise. However, the Code requires 20% downpayments for lump-sum offers. § 7122(c)(1)(A)(i).

**[\*32]** established they had an overpayment for 2004 or 2005 in excess of amounts the IRS has already credited for 2006 and have not presented evidence that establishes uncredited overpayments. Moreover, petitioners seem to mix up the terms "deficiency" and "overpayment." For example, they calculated a deficiency of $30,935 for 2005 based on their payments of $54,137 less $23,202 of assessed tax. A deficiency is the difference between the amount of a taxpayer's tax determined by the IRS and the tax reported on his return. § 6211(a). The amount of a deficiency is determined without regard to payments and credits of overpayments from other years. § 6211(b)(1). The amount of petitioners' deficiency for 2006 will be determined in a Rule 155 computation, and thereafter, the amount petitioners have left unpaid can be computed.

Petitioners spent a substantial amount of time during the trial and in their Posttrial Briefs trying to relitigate not only issues the Court previously decided but also issues respondent has conceded. They misquoted and mischaracterized evidence in the record and made allegations of wrongdoing not supported by evidence.

VII.  *Conclusion*

In accordance with the parties' concession, respondent has agreed to release the NFTL with respect to 2004 and 2008. We will sustain Appeals' determination to uphold the NFTL for 2006. With respect to 2006, we agree with respondent's adjustments subject to his concessions during the audit reconsideration.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*